468 F.2d 872
 152 U.S.App.D.C. 28
 The COMMONWEALTH OF PUERTO RICO, Petitioner,
v.
FEDERAL MARITIME COMMISSION and United States of America, Respondents,
Transconex, Inc., and Consolidated Express, Inc., Intervenors.
 No. 24741.
 United States Court of Appeals,
District of Columbia Circuit.
 Sept. 29, 1972.
 
 Mr. Edward Schmeltzer, Washington, D.C., with whom Messrs. Mario F. Escudero and Burton L. Raimi, Washington, D.C., were on the brief, for petitioner.
 Mr. Gordon M. Shaw, Atty., Federal Maritime Comm., of the bar of the Supreme Court of Ill., pro hac vice, by special leave of Court, with whom Messrs. James L. Pimper, Gen. Counsel, Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Comm., and Irwin A. Seibel, Atty., Dept. of Justice, were on the brief, for respondents. Mr. Paul J. Fitzpatrick, Atty., Federal Maritime Comm., also entered an appearance for respondents.
 Mr. Arthur Liberstein, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Mr. Joseph Rotwein, Washington, D.C., was on the brief, for intervenors.
 Before BAZELON, Chief Judge, and WRIGHT and LEVENTHAL, Circuit Judges.
 LEVENTHAL, Circuit Judge:
 
 
 1
 The Commonwealth of Puerto Rico (Puerto Rico) petitions to review an order of the Federal Maritime Commission (FMC) issued pursuant to the Shipping Act of 1916, 46 U.S.C. Sec. 801 et seq., and the Intercoastal Shipping Act of 1933, as amended, 46 U.S.C. Sec. 843 et seq., discontinuing an investigation and hearing into the lawfulness of certain proposed rate increases filed by Transconex, Inc. and Consolidated Express, Inc. The investigation and hearing were discontinued on the ground that the parties challenging the rate proposals had the burden of proof to demonstrate that they were unlawful, and had failed to discharge their burden. We reverse and remand.
 
 
 2
 A. The Commission's Discontinuance of its Proceeding
 
 
 3
 The FMC's jurisdiction over the rates of common carriers by water in interstate commerce includes the offshore domestic commerce involved in this case, between the Continent and Puerto Rico/Virgin Islands. 46 U.S.C. Secs. 801, 843.
 
 
 4
 Transconex and Consolidated are subject to the jurisdiction of the FMC as non-vessel operating common carriers by water (NVOCCs).[1] While otherwise assuming and performing the obligations of common carriage, they do not themselves own or operate vessels, but arrange for transport by an underlying carrier. Each individually filed schedules of proposed rate increases, to take effect, respectively, April 30 and June 10, 1969. On April 28 and June 6, the FMC issued "Orders of Investigation" that provided for public investigation and hearings "to determine whether (the increases) would be unjust, unreasonable or otherwise unlawful under section 18(a) of the Shipping Act, 1916, and/or sections 3 and 4 of the Intercoastal Shipping Act." The Commission did not suspend the proposals pending the hearing. Puerto Rico intervened to oppose the Transconex increases and filed a protest to the Consolidated increases. The Presiding Examiner filed an Initial Decision on March 23, 1970, discontinuing the investigation. The Commission affirmed on August 27, 1970.
 
 
 5
 Initially, the carriers suggested that the FMC convene rulemaking proceedings to establish "guidelines" for evaluating the rates of NVOCCs. Such rulemaking, they contended, must precede review of individual rate proposals like theirs. NVOCCs were declared subject to the FMC's ratemaking jurisdiction in 1961, see note 1, supra. Apparently, the FMC has never undertaken a thoroughgoing investigation of the appropriate ratemaking approach for that particular type of common carrier.
 
 
 6
 The FMC recognized that the ratemaking criteria applicable to NVOCCs differ considerably from those applicable to vessel-operating carriers. In regulation of vessel-operating carriers the extent of capital investment, and reasonable rate of return thereon, are the key to appraisal of reasonableness of rates.[2] The typical NVOCC has a very modest capital investment compared to gross income. The FMC concurred in the proposition, recognized by the Examiner and all parties, that "the considerations with respect to rates of NVOCCs must necessarily be somewhat different from those which are of prime importance in proceedings dealing with the reasonableness of rates of vessel owning carriers," namely the reasonableness of rate of return on "rate base."[3]
 
 
 7
 The FMC, like the Examiner, rejected the suggestion for immediate rulemaking, taking the position that it was appropriate to evaluate the reasonableness of individual proposals even though general standards for NVOCCs had not yet been established.
 
 
 8
 The parties disagreed before the Examiner and the Commission as to the proper criteria for testing the reasonableness of the rate proposals. Puerto Rico contended for a standard of the "lowest just and reasonable rates" in order to preserve for Puerto Rican industry a competitive position against mainland industry. It emphasized the importance of shipping costs to Puerto Rican concerns that must generally pay not only for the exportation of their finished products, but for the importation of raw materials as well.
 
 
 9
 Transconex and Consolidated urged the use of an "operating ratio" theory, similar to the theory employed by the Interstate Commerce Commission to determine rates for carriers that own relatively little equipment and hence have an invested capital that is relatively low in relation to operating income. The operating ratio formula expresses the relation of operating expenses to operating income, in percentage form. An agency using this theory would fix a minimum permissible operating ratio, which amounts in effect to a maximum permissible "operating" rate of profit on revenues.
 
 
 10
 The FMC agreed that the operating ratio concept, applied to "probable revenues and expenses related to the increases" sought by the carriers, provided in general an appropriate frame for decision-making. However, it hesitated to rely exclusively on the operating ratio approach because of the "inherent" inability of the formula to take account of factors, like an NVOCC's capital investment, that are relevant though not decisive in rate investigations.[4] Thus "the operating ratio approach per se, may not give a true picture of the revenue requirements of a carrier." J.A. 38.
 
 
 11
 The FMC evaluated the evidence and the Examiner's findings and concluded that they
 
 
 12
 tend to justify increases in the charges made by respondents for their transportation services, if not the particular dollar amounts here under investigation.[5]
 
 
 13
 It then stated: "We have no basis for concluding, however, that such increased charges are unlawful." It referred to the computations made of the operating ratios of the parties, and, considering income taxes as an operating expense,[6] it found the operating ratios for both Transconex and Consolidated "exceeds the 93 percent, which the ICC appears frequently to have approved when considering rate increases of carriers owning little or no equipment." The FMC expressly agreed with its Hearing Counsel that "there has been no showing on this record that a 93% ratio is necessarily proper or standard for NVOCCs." Its reasons for discontinuing the investigation are set forth in this paragraph:
 
 
 14
 However, since we feel that the traditional rate base approach cannot be applied to these carriers, at least where, as here, there has been no showing of any relationship between such rate base and the carriers' operating ratios, we cannot disapprove the rate increases. Some indication of need for increases has been shown, and no computation we have been able to make with respect to the increases shows them to be improper. Those challenging rate increases in proceedings where such increases have not been suspended must bear the consequences of the failure of the record to contain adequate support for their disapproval. Charges, Delivery, Atlantic-Gulf/Puerto Rico Trades, 11 F. M.C. 222, 229-231 (1967).
 
 
 15
 The brief filed in defense of the Commission's action explains (p. 4):
 
 
 16
 The Commission held, in accordance with prior practice, that its statutory authority (section 3, Intercoastal Shipping Act, 1933, 46 U.S.C. Sec. 845, and its rules of practice and procedure 46 CFR 502.155), placed the risk of an inadequate record for the finding of unlawfulness of such rates upon those seeking to have them disapproved. (CD 12.) The Commission therefore discontinued the proceeding.
 
 B. The Issue of Burden of Proof
 
 17
 This appeal turns on the issue of "burden of proof," i. e., the consequence of an inadequate record for the determination of invalidity of carrier rate increases under investigation by FMC.[7]
 
 
 18
 1. We begin our consideration with an analysis of the statutes administered by the FMC. While they appear to reflect piecemeal legislative response to industry changes, rather than a clear-cut statutory scheme, there are provisions that help us to define if not resolve the issue at hand. For convenience, we shall refer to the authority granted by Congress to the "Commission" without naming the prior agencies whose functions were ultimately transferred to FMC.
 
 
 19
 Section 18 of the Shipping Act of 1916 as amended, 46 U.S.C. Sec. 817, required every common carrier by water in interstate commerce to establish "just and reasonable rates." It required the carrier to file, for public inspection, its maximum rates, and prohibited collection of a greater compensation except after ten days public notice stating the increase proposed to be made. This section concludes: "Whenever the Commission finds that any rate . . . demanded, charged, collected or observed by such carrier is unjust or unreasonable, it may determine, prescribe, and order enforced a just and reasonable maximum rate. . . ."
 
 
 20
 The 1916 Act also provided, in Sec. 22, see 46 U.S.C. Sec. 821, that any person may file a complaint alleging a violation of the statute and seeking "reparation for the injury, if any, caused thereby", and that, after answer by the carrier and investigation, the Commission may direct payment of full reparation for the injury caused by such violation.
 
 
 21
 The Intercoastal Shipping Act, 1933, amended the Shipping Act of 1916. Section 3 of the 1933 Act, 46 U.S.C. Sec. 845, requires the filing of all rates, not merely maximum rates, with provision for 30 days' notice prior to a change unless waived by the Commission. This change in filing requirements, provided in 1933 for carriers in "intercoastal commerce" (i. e., transiting the Panama Canal), was extended in 1938 to all common carriers by water in interstate commerce.[8] That 1938 statute also added to the 1933 law a new section, Sec. 4, providing that whenever the Commission "finds that any rate . . . demanded, charged, . . . is unjust or unreasonable, it may determine, prescribe, and order enforced a just and reasonable maximum or minimum, or maximum and minimum rate."[9] The legislative history of the 1938 extension reflects an intent that common carriers by water subject to this Commission's rate regulation, be governed by features of regulation like those pertaining to common carriers subject to ICC jurisdiction. "The regulation of the water carriers has existed for 20 years and the experience gained has shown a necessity for a gradual broadening of the power of regulation in order to prevent abuses." "The interest of both carriers and the shipping public are best served by rate stability. This stability can best be secured by requiring the carriers to file and post their actual rates and by permitting such actual rates to be changed only after a reasonable period of time."[10]
 
 
 22
 2. Focusing particularly on the procedures of Sec. 3 of the 1933 Act, set forth in its present form in the margin,[11] the first paragraph provides that "whenever there shall be filed . . . a new . . . rate, the [Commission] shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, and if it so orders without answer or other formal pleading by the interested carrier . . . but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate. . . ." The second paragraph authorizes the FMC to suspend proposed rates for up to four months pending the outcome of the hearings, upon notice to the carriers and a statement of reasons for the suspension.
 
 
 23
 The suspension power, a "proshipper" provision,[12] had two principal purposes: to enable shippers to avoid interim payment of rates eventually to be declared unlawful; and to encourage moderation by carriers in their rate proposals as a means of avoiding suspension.[13] Between 1933 and 1939, the Maritime Commission (and its predecessor Board) suspended proposed rates in every case in which hearings were ordered pursuant to section 3.
 
 
 24
 In 1939 the Commission sought a statutory provision on burden of proof.[14] Its letter advised Congress that it viewed existing law as placing the burden of proof on the carrier in all suspension proceedings, since otherwise "the carrier might remain mute and put the burden on the Commission or complainant to present evidence, the bulk of which may be in the possession of the carrier." Its position was consistent with that of the ICC where the statute expressly placed the burden of proof on any carrier seeking an increase. But, the Commission noted, carriers had challenged the ICC's assignment of the burden of proving reasonableness of a new rate upon a carrier proposing a rate decrease. And so it suggested (see note 14) an amendment "to provide that in cases involving the suspension of rates, the burden of proof is on the carrier. . . . Clarification of the statute as suggested would simplify its administration." Congress granted the Commission's request-adding to the second paragraph of Sec. 3 what is now the penultimate sentence, see note 11, providing:
 
 
 25
 At any hearing under this paragraph the burden of proof to show that the rate, fare, charge, classification, regulation, or practice is just and reasonable shall be on the carrier or carriers.
 
 
 26
 Congress's approval of the Commission's approach is reflected in the Senate Report, No. 724, 76th Cong., 1st Sess., p. 2 (1939), in language almost identical with the House Report:
 
 
 27
 Section 2 clarifies section 3, Intercoastal Shipping Act, 1933, to establish in so many words the rule believed to be applicable under existing law, that in cases involving the suspension of rates the burden of proof is on the carrier to show that the rates, practices, etc., are just and reasonable. If the rule were otherwise, the carrier might remain silent and require the complainant or the Maritime Commission to present evidence, though in most situations the bulk of such evidence is in the possession of the carrier. It is evident that Congress when it established the existing law, did not intend to permit such a result.
 
 
 28
 Under the section as amended, the burden of proof will not be placed on the carrier in ordinary complaint proceedings, but only in suspension proceedings.
 
 
 29
 The Interstate Commerce Act, as amended, in section 15, contains a somewhat similar provision which places the burden of proof on the carrier with respect to any rate, fare, or charge sought to be increased.
 
 
 30
 3. The FMC takes the position that since this provision relates only to "hearings under this paragraph," and the paragraph refers to cases when rates have been suspended, in all other cases the burden of proof rests on those attacking the rate change. It issued the following regulation, see Rule 10(o) of Commission's rules of practice and procedure, 46 CFR 502.155:
 
 
 31
 "(o). Burden of proof
 
 
 32
 At any hearing in a suspension proceeding under section 3 of the Intercoastal Shipping Act, 1933, Rule 5(g) . . . the burden of proof to show that the suspended rate . . . is just and reasonable shall be on the respondent carrier or carriers. In all other cases, the burden shall be on the proponent of the rule or order."
 
 
 33
 The Commission has ruled that under the wording of the 1933 statute the burden of proof is on the carrier only in suspension cases. Charges, Delivery, Atlantic-Gulf/Puerto Rico Trades, 11 F. M.C. 222, 231 (1967).
 
 
 34
 4. We begin by identifying, and rejecting, what seems to be an implied premise of the FMC, that there must be a statutory provision putting the burden of proof on the carrier, otherwise it rests on those challenging the carrier. Even prior to 1939, and even in the absence of a statutory provision as to burden of proof, the Commission took the view that in suspension cases the burden of proof was on the carrier. The amendment to Sec. 3 was proposed, and adopted, in 1939, not as a change in the law, but as a "clarification" confirming the Commission's view as to "the rule believed to be applicable under existing law." Thus, the Senate Report voiced the view that the 1933 law, even in the absence of an express provision on burden of proof, permitted the Maritime Commission to put the burden on the carrier in suspension cases.
 
 
 35
 5. The Commission and the carriers invoke a kind of expressio unius doctrine-that "when statutes specifically place the burden of proof upon carriers with respect to certain kinds of rate proceedings, the carriers do not bear such burden with respect to other types of rate proceedings." (FMC Br. 12).[15]
 
 
 36
 A similar argument could have been made as to the meaning of Sec. 3 of the 1933 Act, prior to the 1939 amendment, since Sec. 3 was obviously patterned on the statute for carrier filings of new rates with the ICC and hearings by the ICC to determine lawfulness of new rates,[16] yet had failed to transfer over the provision in ICC's law putting the burden of proof on the carrier to show that an increased rate is reasonable. Yet the Commission's action in putting that burden on the water carriers even prior to the 1939 amendment was approved in the reports of the Congressional committees, and confirmed in the "clarifying" amendment.
 
 
 37
 The FMC's current approach does not take full account of the legislative history and context. When the Commission sought, and Congress supplied, in Sec. 3 of the Intercoastal Act, express burden of proof provisions for suspension cases, suspension cases were the only kind of rate proceedings conducted under Sec. 3. Section 3 proceedings with rates not suspended only developed some years later. Under these circumstances, the provision requiring the burden of proof to be borne by the carrier in suspension cases cannot fairly be taken as reflecting any legislative intent to prohibit assignment of the burden of proof to the carrier in the situation of non-suspension cases, a situation not noted by the Commission or Congress and apparently not visualized.
 
 
 38
 Congress's explicit concern was to allocate the burden of proof to the carrier proposing a change as the party most likely in possession of the bulk of the relevant evidence as to the reason and justification for the change. What is true of suspension cases in this respect applies as well to all cases where the carrier proposes a change of rates and the Commission begins an investigation and proceeding before the rates become effective. These considerations are not removed by the fact that the Commission decides not to suspend the proposed rates. The non-suspension may reflect a determination that the balancing of interests is best served by avoiding the possibility of irreparable injury to carriers (and injury to the public service) pending the investigation, without any judgment as to reasonableness of the proposed rates, but rather with a judgment that that issue should be determined after a proceeding wherein pertinent evidence is adduced by the parties properly called upon therefor.
 
 
 39
 A ruling that the burden of proof inexorably shifts from the carrier to opponents by a non-suspension action would make the result on the merits, in a proceeding to vindicate the public interest, dependent on a preliminary equitable assessment reached for the purpose of governing the situation pendente lite. We cannot fairly glean such an intent from the 1938 silence of Congress on the non-suspension case, a matter that simply was not presented to the legislature at that time as a problem to be decided, one way or the other. Nor can we reach such a result by reference to the kind of general guide to legislative intent that is afforded by expressio terms, or like canons of construction, when we have available more specific indications as to the policies that motivated the adoption of the other provisions of the law. Rather, we must reconstruct, as best we can, legislative intent for the situation not expressly covered, by starting with the areas where the legislative intent is express, "and projecting to fair and reasonable corollaries of that intent for the specific issue" that was not considered.[17]
 
 
 40
 The Congressional contemplation is indicated by the general regulatory pattern under which the provisions earlier evolved for carriers subject to ICC jurisdiction (see note 16) were a template for statutes pertaining to utilities and carriers subject to rate regulation by other agencies. Under these statutes rate changes of regulated carriers and utilities were deferred for a 30-day notice period, subject to Commission waiver; the rate changes were subject to investigation and hearing begun on notice, though without an answer or other pleading by the utility or carrier; there was provision for suspension for a certain period of time, ranging from 3 to 7 months; there was provision permitting the rates to go into effect at the end of this suspension, subject to ultimate determination of reasonableness; and there was provision-not limited to suspension cases-that the burden of proof to show reasonableness of rate increases was on the carrier or utility involved.[18]
 
 
 41
 These statutes constitute a "common lore" of basic approach in rate regulation, of the propriety of requiring a regulated company proposing to increase its rates to bear the burden of proving the justification for the increase. The legislative history of the 1938 extensions to common carriers by water in interstate commerce (supra, pages 876-877) reflects a Congressional intention that these be covered by the regulatory approaches evolved in other agencies, notably the ICC, and it was at this time that the 10-day notice-and-wait period was changed to a 30-day period, the same as that provided for carriers subject to ICC and, indeed, for the various other regulated utilities and carriers (see note 18). The 1939 legislative history shows clearly that common carriers by water in interstate commerce were considered in the same category as the other regulated carriers and utilities, as being reasonably called upon to bring forth the facts showing the reasonableness of proposed increases. These significant considerations, all manifestly pertinent to the public interest, are far more revealing of the underlying intent of Congress than the circumstance, really happenstance, that the 1939 recommendation by the Maritime Commission was put in terms of suspension cases, at a time when these were the only cases in which the Commission had held hearings.
 
 
 42
 Accordingly, we discern an intent as to Sec. 3 of the Intercoastal Act, to permit the FMC to require a carrier proposing a rate increase, set during the 30-day notice period for hearing on reasonableness, to meet the burden of justifying the reasonableness of its proposed change. The carrier has shown neither wording nor intention that it should be free of all risk of incompleteness of the record merely because the rate change was not suspended.
 
 
 43
 6. The Commission and carriers also claim that the general doctrine that "the proponent of a rule or order has the burden of proof"-also set forth in Sec. 7(d) of the Administrative Procedure Act, 5 U.S.C. Sec. 556(d)-means that once rates have gone into effect, an FMC order is required to change the situation, and the burden of proof is on the party seeking such an order. The doctrine that the proponent of an order has the burden of proof is satisfactory as a general principle, but it is subject to reasonable construction and limitations. Even in an ordinary civil case, the doctrine that plaintiff has the burden of proof, is subject to overriding qualifications placing burdens on those naturally possessed of pertinent evidence. That analogy was referred to by the Congressional committee that accepted the Commission's then view as to the thrust of Sec. 3.
 
 
 44
 Ultimately, the rule requiring the proponent of an order to sustain the burden of its justification rests on the policy of requiring a person seeking a change from the status quo to take on the burden of justifying the change. The refinement applicable in the case of rate regulation of a utility or carrier turns on the consideration that Congress regards the utility or carrier as the person seeking to change the status quo when it files a rate increase. Congress has interposed a requirement of reasonable notice, and opportunity for investigation and institution of a hearing, before the status quo can be changed. This Congressional pattern-of notice of change, time for investigation, authority to order a hearing on notice but without carrier pleading-establishes a context that broadly includes and confirms the reasonableness of requiring the regulated company proposing a rate increase, noticed for hearing, to bear the burden of justification in the hearing proceeding. The situation is different from that which pertains when a proceeding is begun to set aside a settled rate, put into effect without any overhanging hearing, that now is alleged to be exorbitant or unjustly high.[19]
 
 
 45
 The widespread regulatory pattern establishes that Congress finds a public interest in requiring the utility or carrier to bear the burden of proof on the reasonableness of a rate increase, even though the law requires a finding of unreasonableness before the increase can be set aside. A public utility or common carrier is not freed from all risk of incompleteness in the record by the circumstance that the law requires an agency determination that the proposed rate or practice is unjust, or contrary to the public interest.[20]
 
 
 46
 7. The Commission's undeniable latitude to refrain from an investigation, subject to little if any judicial review, cannot by itself justify the termination of a proceeding that has been the subject of notice, evidence, an Examiner's decision and appeal therefrom.[21] This is not a case where the Commission exercised its discretion to terminate one proceeding in a context of furthering the public interest in sound regulation through the conduct of an alternative proceeding.[22] What the agency did here was to terminate a proceeding on the issue of failure of those opposing the rate increase to meet a supposed burden of proof, and to leave the matter in limbo; that action, we hold, is invalid.
 
 
 47
 We have not tried in this opinion to refine the concept of burden of proof, as applied to regulatory proceedings. Obviously, it means something different from the familiar concept of civil litigation, often addressed to a fact like, say, fraud, that is relatively free of normative content. The issue of reasonableness of rates has normative content, accounting for the popularity, at least at one time, of calling it a "mixed" question of law and fact. Whether and in what situations the burden put on the carrier must end, and pass to the agency to begin an evolution of standards, is a matter not before us in this case, given its present posture.
 
 
 48
 We do not purport to say that the present record requires a determination adverse to the carriers. It is for the Commission to consider what regulatory approach-as to standards, and procedure-is appropriate in the light of the showing made by the carriers as to cost increases and profit margins. What we hold is that the Commission may not validly determine a rate proceeding, where there has been no suspension of rate changes, on the basis of an erroneous broad premise that in a proceeding begun to investigate a proposed rate increase the law prohibits assignment to the carrier of any risk on account of inadequacy of the record. We think the appropriate disposition is to remand for further proceedings that will not be infected by such an erroneous premise.
 
 
 49
 The order of the Commission is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.
 
 
 50
 So ordered.
 
 
 
 [1]
 In Determination of Common Carrier Status, 6 F.M.C. 245 (1961), the Commission's predecessor determined that an NVOCC is a "common carrier by water in interstate commerce" within the meaning of section 1 of the Shipping Act and is subject to the rate making standards of both the Shipping and Intercoastal Acts
 The functions and importance of NVOCCs are set forth in the Examiner's Finding 4, as follows:
 The services provided by respondents and included in a single factor rate are the pickup and delivery of cargo at the shippers' or consignees' door in Puerto Rico and on the mainland at terminals maintained by respondents, all necessary documentation, assumption of responsibility for the goods from door to door, and the arranging for water transportation via an underlying carrier. Respondents are usually able to expedite shipments. It would be difficult for many small Puerto Rican shippers and consignees to remain in the trade without the services provided by respondents and other NVOCCs. Respondents collect small shipments, and at a terminal provided for that purpose consolidate them into containers which are delivered by respondents to the underlying carrier. If each individual shipper were required to deliver to or receive small shipments directly from a water carrier, the resulting congestion on the docks would delay carriage substantially and discourage the small shipper from engaging in commerce over water.
 
 
 [2]
 Compare FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)
 
 
 [3]
 Opinion pp. 10-11, JA 37. The FMC notes: "Generally speaking, the reasonableness of the rate of return of equipment owning carriers has been based upon that percentage of their 'rate base', i. e., the property devoted to the relevant trade plus sufficient working capital, which is necessary to allow them to earn a reasonable return in light of the peculiar risks of the service involved."
 
 
 [4]
 "The Commission . . . acknowledged . . . that the operating ratio approach, per se, might not give a true picture of the revenue requirements of a carrier since the ratio by itself fails to indicate the existence and degree of need for additional capital and revenue." FMC brief, p. 2
 
 
 [5]
 The pertinent paragraph of the FMC's Conclusions reads:
 Evidence of record and the following uncontested findings of the Examiner strongly suggest that respondents' increased rates are just and reasonable: Respondents have experienced increased costs of operation; they operate efficiently; their operations are increasing; competition in the trade is sharp, ordinarily a strong control over rates; and the value of the services rendered by respondents to small shippers is substantial. Such findings tend to justify increases in the charges made by respondents for their transportation services, if not the particular dollar increases here under investigation.
 
 
 [6]
 Puerto Rico contends (Br. 30ff) that the FMC erred in calculating the operating ratios on an after tax basis
 The FMC brief states (Br. 18ff) that the FMC had properly allowed taxes as an expense, since failure to do so would create an inaccurate picture of the earnings actually available to a company for distribution and capital investment and, consequently, its need for additional revenue.
 However, as we understand it, Puerto Rico's contention is that the FMC did not evolve its own standards as to operating ratio, but invoked the 93% operating ratio standard used by the ICC, and that this could not validly be used as a comparison or standard except on the same basis as that used by the ICC, which generally measures reasonableness by the ratio of operating expenses, without addition of tax liability, to gross revenues.
 The FMC brief contends (Br. 20) that on refined analysis the ICC's rulings support its approach, and that in any event the discussion is academic since the FMC "had no means of measuring the carriers' need for additional revenue and capital" and hence "could not determine what would be a proper operating ratio for them."
 In view of the ground adopted in this opinion, we are not required to resolve this issue.
 
 
 [7]
 Puerto Rico assails the FMC's action in this case as a "determination that the increased rates were not unjust or unreasonable," and seeks to invalidate it, asserting that the Commission failed to make findings based on substantial evidence. But that essentially is not a separate issue from the claim that the FMC improperly allocated the burden of proof, at least in the posture of this case
 
 
 [8]
 Act of June 23, 1938, adding Sec. 5 to the Intercoastal Act, see 46 U.S.C. Sec. 845b
 
 
 [9]
 See 46 U.S.C. Sec. 845a
 
 
 [10]
 H.R.Rep.No.2168, 75th Cong., 3d Sess. (1938) p. 28; Sen.Rep.No.1618, 75th Cong., 3d Sess. (1938) p. 21
 
 
 [11]
 46 U.S.C. Sec. 845:
 Whenever there shall be filed with the [Commission] any schedule stating a new individual or joint rate, fare, or charge, or any new individual or joint classification, or any new individual or joint regulation or practice affecting any rate, fare, or charge, the [Commission] shall have, and it is given, authority, either upon complaint or upon its own initiative without complaint, and if it so orders without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, fare, charge, classification, regulation, or practice: Provided, however, That there shall be no suspension of a tariff schedule or service which extends to additional ports, actual service at rates of said carrier for similar service already in effect at the nearest port of call to said additional port.
 Pending such hearing and the decision thereon the Federal Maritime [Commission], upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, charge, classification, regulation, or practice, but not for a longer period than four months beyond the time when it would otherwise go into effect; and after full hearing whether completed before or after the rate, fare, charge, classification, regulation, or practice goes into effect, the [Commission] may make such order with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, charge, classification, regulation, or practice shall go into effect at the end of such period. At any hearing under this paragraph the burden of proof to show that the rate, fare, charge, classification, regulation, or practice is just and reasonable shall be upon the carrier or carriers. The [Commission] shall give preference to the hearing and decision of such questions and decide the same as speedily as possible.
 
 
 [12]
 See, e. g., testimony of the Director of the Shipping Board's Bureau of Regulation and Traffic; House Hearings on S. 4491, p. 420, 72d Cong., 2d Sess. (1933). See also testimony of W. G. Stone, Manager of Transportation Department, Sacramento Chamber of Commerce, id. at 156
 
 
 [13]
 See Stone, supra, note 12
 
 
 [14]
 See Maritime Commission's Recommendations for Legislation, H.Doc.No. 208, 76th Cong., 1st Sess., pp. 2-3 (1939)
 
 
 [15]
 FMC's brief cites American Louisiana Pipe Line Co. v. FPC, 120 U.S.App.D.C. 140, 344 F.2d 525 (1965); Anchor Coal Co. v. United States, 25 F.2d 462 (D.C. S.D.W.Va.), reversed as moot, 279 U.S. 812, 49 S.Ct. 262, 73 L.Ed. 971. These cases are distinguishable. They apply the judicially developed principle that carriers did not bear the burden of proof to justify rate decreases when the regulatory statutes involved-the Interstate Commerce Act and the Natural Gas Act-provided that the burden of proof would be on the carriers with respect to proposed increases but said nothing about the burden of proof in other types of rate proceedings. We note, first, that in 1940, Congress changed the rule under the Interstate Commerce Act so that carriers now bear the burden in all rate proceedings, 49 U.S.C. Sec. 15(7). More importantly, there is a basis for imposing different burden of proof rules in justifying rate decreases, rather than increases, that does not justify different rules for suspension as opposed to non-suspension cases. A rate decrease is sought generally to enhance a carrier's competitive position, and so pits it against competitors and other affected businesses in complaint proceedings. Such opponents are more likely to have access to the same general fund of information concerning the rate proposals and so will not be at a decisive disadvantage if they have to bear the burden of proof. That is not the case when the contest pertains as here to a rate increase, which pits the carriers against its consumers, whether or not rates are suspended
 
 
 [16]
 49 U.S.C. Sec. 15(7) (1934 ed. p. 2224)
 
 
 [17]
 Montana Power Co. v. FPC, 144 U.S. App.D.C. 263, 270, 445 F.2d 739, 746 (en banc, 1970), cert. denied, 400 U.S. 1013, 91 S.Ct. 566, 27 L.Ed.2d 627 (1971)
 
 
 [18]
 See, e. g., 47 U.S.C. Sec. 204 (1934 law, telegraph and telephone carriers); 16 U. S.C. Sec. 824d(e) (1935 law, electric energy public utilities); 15 U.S.C. Sec. 717c(e) (1938 law, natural gas companies). The provisions as to air carriers conform to the same general pattern, but without express provision as to burden of proof. 49 U.S.C. Sec. 1482 (1938 law, recodified in 1958)
 Perceptive commentary on the actual experience of Federal agencies concerned with use of the suspension power is available in R. Spritzer, Uses of the Summary Power to Suspend Rates: An Examination of Federal Regulatory Agency Practices, 120 U.Pa.L.Rev. 39 (1971) (discussing ICC, FCC, CAB and FPC).
 
 
 [19]
 We need not consider here whether or to what extent the public interest requires an agency to raise a timely question concerning a rate increase. Compare Atlantic Refining Co. v. Public Service Comm., 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959) (CATCO case). This is a different question from the reviewability of a lack of suspension, cf. Municipal Light Boards v. FPC, 146 U.S.App.D.C. 294, 450 F.2d 1341 (1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972)
 
 
 [20]
 Compare FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 88 S.Ct. 1005, 19 L.Ed.2d 1071 (1968); Latin America/Pacific Coast Steamship Conference v. FMC, 150 U.S.App.D.C. ___, 465 F.2d 542, at p. 553 (1972), indicating that when a party shows the existence of a nonfrivolous antitrust question the agency rightly shifts the burden of proof to those seeking antitrust limitations
 
 
 [21]
 Minneapolis Gas Co. v. FPC, 111 U.S. App.D.C. 16, 294 F.2d 212 (1961); see Eastern Air Lines, Inc. v. CAB, 111 U.S.App.D.C. 39, 41-42, 294 F.2d 235, 237-238, cert. denied, 368 U.S. 927, 82 S.Ct. 363, 7 L.Ed.2d 191 (1961)
 
 
 [22]
 Wisconsin v. FPC, 373 U.S. 294, 83 S.Ct. 1266, 10 L.Ed.2d 357 (1963); Philadelphia TV Broadcasting Co. v. FCC, 123 U.S.App.D.C. 298, 359 F.2d 282 (1966)