The **NATIONAL ORGANIZATION FOR the REFORM OF MARIJUANA LAWS (NORML) et al., Petitioners,**

v.

**John E. INGERSOLL et al., Respondents.**

**No. 72–1854.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1973.

Decided Jan. 15, 1974.

Kenneth Baumgartner and John J. Cohrssen, Washington, D. C., for petitioners.

Allan P. MacKinnon, Atty., Dept. of Justice, with whom Henry E. Peterson, Asst. Atty. Gen., Harold H. Titus, Jr., U. S. Atty., John A. Terry, Asst. U. S. Atty., and Allyn Myles Carnam, Atty., Office of Chief Counsel, Drug Enforcement Administration, were on the brief for respondent.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case is before us on a petition for review of the rejection of a petition which sought to initiate a rule-making proceeding looking toward a change in the control applicable to marihuana under the Controlled Substances Act (21 U.S.C. § 801 et seq.)

The rule-making petition was filed May 18, 1972, by The National Organization for the Reform of Marijuana Laws (NORML) and other organizations concerned with the Federal Government's treatment of the marihuana problem. The petitioners requested that respondent remove marihuana from control under the Act, or in the alternative, transfer marihuana from Schedule I to Schedule V in the control scheme established by that Act.

The rule-making petition was filed with, and the petition in this court named as respondent, the Director of the Bureau of Narcotics and Dangerous Drugs, to whom the Attorney General

had delegated his authority under the Act.[1] We remand for further proceedings.

### A. *The Rejection of the Rule-making Petition*

The response to the petition reflects some official confusion.[2] We are asked to review the decision dated September 1, 1972, published in the Federal Register of September 7 (37 Fed.Reg. 18097), that the petition was not accepted for filing on the ground that respondent "was not authorized to institute proceedings for the rule requested." He specified in this connection the provisions of the Act and its legislative history which he relied upon as the basis for his opinion; namely, that by virtue of Section 201(d) of the Act, 21 U.S.C. § 811(d), he was required to establish the controls appropriate to carry out obligations under the Single Convention on Narcotic Drugs, 1961, 18 U.S.T. 1407 (1967) ("Single Convention") and that these obligations insofar as marihuana is concerned precluded consideration of either removing marihuana from all schedules or transferring it from Schedule I to Schedule V.

The petition in this court was filed on September 12.[3]

### B. *Basic Authority to Decontrol Substances or Transfer to Different Schedules*

The Act's classification scheme was a cardinal feature of the effort by Congress to rationalize the Federal Government's control programs for dangerous drugs.[4] The Act's five Schedules define classes of drugs and substances pursuant to criteria set in terms of dangers and benefits of the drugs. Differences in consequences and sanctions attach to the differences in classification. For example, the offense of distribution is a felony as to Class I drugs, a misdemeanor as to Class V drugs.[5]

Congress contemplated that the classification set forth in the Act as originally passed would be subject to continuing review by the executive officials concerned, notably in the Department of Justice and the Department of Health, Education and Welfare. Provision was made for further consideration, one taking into account studies and data not available to Congress when the Act was passed in 1970. Section 202 of the CSA, 21 U.S.C. § 812, establishing the schedules of controlled substances, provides that "such schedules shall *initially* consist of the substances listed." (Emphasis added.) Subsection (c) provides "Schedules I, II, III, IV and V shall, unless and until amended pursuant to [21 U.S.C. § 811] consist of the following drugs. . . ." In subsection (a) of § 201 of the Act, 21 U.S.C. § 811, Congress provides that the Attorney General shall apply the provisions of the Act to the controlled substances listed in the schedules (in § 202) and other drugs added to such schedule, and "may, by rule," add substances to a schedule, transfer

---

1. A reorganization occurred within the Department of Justice while the case was pending in this court and the action was continued against the Director of the Drug Enforcement Administration as respondent.

2. On July 27, 1972, respondent filed a notice with the Federal Register announcing that the petition was not accepted for filing. On July 31, 1972, respondent filed what he described as an action causing his earlier action to be "withdrawn." Then came the action of September 7, 1972, under review.

3. It was originally denominated a petition for mandamus. On December 7, 1972, this court denied mandamus, but ordered that the petition be considered as a petition for review filed pursuant to 21 U.S.C. § 877.

4. United States v. Moore, 158 U.S.App.D.C. 375, at pp. 407–410, 486 F.2d 1139, at pp. 1171–1174, 1973 (concurring opinion).

5. In either class, mere possession is only a misdemeanor. Distribution of a small amount of marihuana for no remuneration is treated as a misdemeanor violation, see § 401(b)(4) of the Act, 21 U.S.C. § 841(b)(4).

   We interject that counsel for petitioners, at oral argument, put it that their alternative request for transfer from Schedule I to Schedule V, would have consequence not only in terms of Federal legal sanctions, but also significance as to administration and enforcement of state and local laws, which are influenced by Federal classification.

them between schedules, or "remove any drug or other substance from the schedules."

Section 201(a) of the Act, 21 U.S.C. § 811(a), provides that such rules shall be made on the record after opportunity for hearing, pursuant to the rulemaking procedures prescribed by 5 U.S.C. ch. 5, subch. II. It further provides that proceedings for adding, transferring, or deleting substances may be initiated by the Director on his own motion, at the request of the Secretary of Health, Education, and Welfare, or on the petition of any interested party. 21 U.S.C. § 811(a). The Act provides that the Attorney General, before initiating proceedings to either control a substance or to remove one from the schedules, shall "request from the Secretary [of HEW] a scientific and medical evaluation, and his recommendations". The Secretary is directed to consider certain factors listed in § 201(c)—pharmacological effect, risk to the public health, psychic or psychological dependence. He is also directed to consider any scientific or medical considerations involved in other listed factors—such as actual or relative potential for abuse; history and current pattern of abuse; scope, duration and significance of abuse. The statute provides that the Secretary's recommendations "shall be binding on the Attorney General as to such scientific and medical matters; and if the Secreary recommends that a drug or other substance not be controlled, the Attorney General shall not control the drug or other substance." § 201(b) CSA, 21 U.S.C. § 811(b).

Put in a larger setting, the provisions for modiifcation of Schedules betoken the same approach of ongoing research, study, and supplemental consideration that characterize other provisions. The Controlled Substances Act is the short title for Title II (Controls and Enforcement) of the Comprehensive Drug Abuse Prevention and Control Act of 1970. Other provisions of the legislation provided for studies and researches by HEW or contracting agencies, for coordination of ongoing studies and programs in the White House under the Special Action Office for Drug Abuse, and for establishment, see § 601, CSA, of a Presidential Commission on Marihuana and Drug Abuse. The House Report recommending that marihuana be listed in Schedule I notes that this was the recommendation of HEW "at least until the completion of certain studies now under way," and projects that the Presidential Commission's recommendations "will be of aid in determining the appropriate disposition of this question in the future." H.R.Rep.No. 91–1444 (Part 1), 91st Cong., 2d Sess. (1970) at p. 13, U.S.Code Cong. & Admin.News 1970, p. 4579.

The Executive is aware of its general authority under the Act to modify the classification initially set by Congress, and indeed has exercised that authority, as in the transfer of amphetamines from Schedule III to Schedule II.

■ The Executive has a corollary responsibility to give appropriate consideration to petitions for reclassification. And, indeed, certain petitions have been designated for official consideration.[6] The respondent's action in declining to accept the petition filed May 18, 1972, does not confront us with a supposed prerogative to reject any petitions before considering them. The action was based on the ground that outstanding

---

6. a. A petition to transfer Pentazocine to schedule III filed by Joseph Fink, III, R. Ph. et al. on October 5, 1971, accepted for filing in a notice appearing in the Federal Register of November 10, 1971 (36 F.R. 21527).

b. A petition to transfer certain depressants to schedule II filed by Robert M. Brandon et al. on March 8, 1972, accepted for filing in a notice appearing in the Federal Register of May 11, 1972 (37 F.R. 9500); and

c. A petition to remove Levodesoxyephedrine (methamphetamine) from control filed by Hexagon Laboratories on March 16, 1972, accepted for filing in a notice appearing in the Federal Register of July 7, 1972 (37 F.R. 13352).

treaty commitments preclude any executive relief, and that becomes the crucial question before the court.

We pass by a subsidiary contention that even if there are current treaty obligations, the executive officials have a duty to consider the petition toward the objective of possible modification of legislative or treaty action. There are some statutes that place on executive officials the judicially enforceable duty of preparing a report even though the subject is one that would require legislative rather than executive action. Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 15, 458 F.2d 827, 837 (1972). We are doubtful whether such a judicially enforceable duty appears in the Controlled Substances Act, at least during a period when the legislature plainly contemplates that reports targeted toward legislative reconsideration will be the province of a specially designated and constituted commission, broadly based so as to reflect the impact of officials selected by both legislative and executive branches. However, even this issue is one that should not be determined prior to a focusing on the major issue, the nature of treaty obligations.

### C. The Issue of the Requirement of Treaty Obligations

1. Government counsel say that unless marihuana is subject to the restrictions imposed by § 306 of the Act (21 U.S.C. § 826), applicable only to Schedules I and II substances, the United States will be unable to carry out its obligations under Article 21 and related provisions of the Convention.[7] As we point out later, this was not made the subject of focused discussion and consideration in respondent's decision.

2. Petitioners assert that the treaty, the Single Convention on Narcotic Drugs, does not regulate marihuana as such, that it regulates "cannabis" and "cannabis resin," and these are carefully defined so as to be inapplicable to the *leaves* of the cannabis plant.[8] They say that the question of removing the leaves from the controls of the Act should be referred to the Secretary of Health, Education and Welfare and that rule-making proceedings should be instituted.

The convention does not specify any mandatory controls the parties must adopt as to the leaves.[9] The petitioners claim that the official commentary

---

7. Article 21 of the Convention puts a maximum on the total quantities of drugs manufactured (Limitation of Manufacture and Importation) and imported by any country in any one year—essentially, to the quantity consumed for medical and scientific purposes, for manufacture of other drugs and of substances not covered by this Convention, and for exports stock replacement. Each country must annually furnish to the International Narcotics Control Board its annual estimates of its drug requirements (Article 19) and specified statistical returns (Article 20).

8. Articles 1(b) and (c) of the Convention provide:
   "Cannabis" means the flowering or fruiting tops of the cannabis plant (excluding the seeds and leaves when not accompanied by the tops) from which the resin has not been extracted, by whatever name they may be designated.
   "Cannabis resin" means the separated resin, whether crude or purified, obtained from the cannabis plant.

In the petition filed with respondent, petitioners cite—for the proposition that "leaves of the cannabis plant . . . are not controlled"—The Cannabis Problem: A Note on the Problem and The History of International Action, United Nations Bulletin on Narcotics, Vol. 14, No. 4 (Oct.–Dec. 1962), p. 31.

9. See Article 28, par. 3. Article 28 provides:
   1. If a Party permits the cultivation of the cannabis plant for the production of cannabis or cannabis resin, it shall apply thereto the system of controls as provided in article 23 respecting the control of the opium poppy.
   2. This Convention shall not apply to the cultivation of the cannabis plant exclusively for industrial purposes (fibre and seed) or horticultural purposes.
   3. The Parties shall adopt such measures as may be necessary to prevent the misuse of, and illicit traffic in, the leaves of the cannabis plant.

makes clear that the Convention permits use of the leaves for recreational purposes.

■ Government counsel say that respondent did not deal with the "leaves" question presented to this court by petitioners, and that this court should affirm respondent's action with permission to petitioners to file a new application under the Act. The Government's brief says the application sought only the removal or transfer of "marihuana" as that term is defined in the Act. We have some difficulties with this procedural approach. It is not at all unusual for persons seeking governmental action —from any of the branches—to pray for the maximum desired, or such other relief as may be deemed appropriate. To say that this may act as a disqualification from obtaining more limited relief is to strain ordinary conceptions of fair procedure, in the absence of an express warning or alert.

4. Moreover, we are uneasy that respondent's own unorthodox procedural devices may have contributed to a procedural impasse and a non-responsive discussion on different planes of discourse.

■ Respondent refused to accept the petition for filing. The outright rejection of the filing of a petition is an executive or administrative action that has only a narrow role. A "rejection" of a party's filing is a "peremptory" action, soundly used only in "the clear case of a filing that patently is either deficient in form or a substantive nullity." Municipal Light Boards v. FPC, 146 U.S.App. D.C. 294, 298, 450 F.2d 1341, 1345, (1971) cert. denied, 405 U.S. 989, 92 S. Ct. 1251, 31 L.Ed.2d 445 (1972).[10]

■ In this case there is no procedural defect or failure to comply with a clear-cut requirement of law. What accounted for respondent's action is his conclusion on the merits that the petition sought action inconsistent with treaty commitment. Even if we accept the argument now put forward by Government counsel as to the relationship between Article 21 of the Treaty and § 306 of the CSA, the point is not obvious or clear-cut, but requires a reflective consideration and analysis. That kind of determination should have been reflected in an action denying the petition on the merits, an action that can be taken without convoking a formal rule-making proceeding when issues of law are decisive and can be decided without taking testimony or hearing the views of others involved.[11] The matter is not critical so far as judicial review is concerned, as appears from our order (footnote 3, *supra*) designating the case as one pending before us on a petition to review a "final decision," filed under § 507 of the Act, 21 U.S.C. § 877. But if this had been handled properly by respondent as a decision on the merits, petitioners could have refined their alternative position in the light of respondent's decision.

Instead they considered respondent's "rejection" of even a filing to signal short shrift for a serious presentation. It was not the kind of agency action that promoted the kind of interchange and refinement of views that is the life-blood of a sound administrative process.

5. More difficult of analysis is the assertion in the Government brief that the "leaves" argument is an "academic after-thought." The petition filed with

10. As the court there put it, the rejection of a filing is a "peremptory" response "which classically is used not to dispose of a matter on the merits but rather as a technique for calling on the filing party to put its papers in proper form and order. Its use is not limited to defects of form. It may be used by an agency where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are fur-

thered by obviating any docket at the threshold rather than opening a futile docket." 146 U.S.App.D.C. at 299, 450 F.2d at 1346.

11. Weinberger v. Hynson, Westcott and Dunning, Inc., 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); Citizens for Allegan County, Inc. v. FPC, 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969).

the Department of Justice in May 1972 was certainly primarily concerned with marihuana in the large. It was filed within two months after the release of *Marihuana: A Signal of Misunderstanding,* the title given to the First Report by the National Commission on Marihuana and Drug Abuse, chaired by Governor Shafer. It relied on that report in good measure, in some respects relying less on the Shafer Report itself than on what petitioners called "the more objective Appendix" for "an accurate picture of the scientific evidence."[12] The contention was that marihuana does not meet the criteria in the Act for Schedules I and II substances, that, e. g., it has neither an actual nor relative "high potential for abuse."

6. The respondent took the petition as addressed to all marihuana plant material as used, including the flowers, and his decision quoted from the petition as follows: "In summary, the plant material of what is commonly called marihuana in the United States consists of a mixture of crushed leaves, flowers and twigs of the Indian Hemp plant, an annual belonging to the single species of *Cannabis sativa.*"[13]

This sentence appears in the petition in passing, as a preliminary to discussion of the state of current knowledge on marihuana. It does not fairly indicate that petitioners were implacably limited in terms of relief sought to the plant as a whole. When the respondent set forth his position on treaty obligation, he did not say one word about the presentation in the petition on the inter-national obligations issue, where the petition expressly points out that leaves are not covered by the treaty and adds: "The narrow definition of marihuana and the attendant limitations on mandatory regulations, are significant since it is the leaves of the marihuana plant that are commonly used in the United States."[14]

7. Obviously, this court is in no position to decide this case in its present posture. Having in mind our doubts as to the propriety of the respondent's action in rejecting even the filing of the petition, we think the optimum course, in the interest of justice, 28 U.S.C. § 2106, and a sound disposition, is to remand the case to respondent for further consideration, to be denominated a consideration on the merits. This consideration will embrace the subject of removal or transfer of control of the leaves of the plant.

◼ On the remand, respondent will also supply findings that will sharpen and clarify the issue whether control under Schedules I and II is required as to the flowers. The decision under review rightly refers to § 201(d) of the Act [15] as establishing a basis for control under the Act if required by treaty obligations. But the decision seems to go further and say that if some control is required by treaty then the decision of which Schedule is appropriate is a matter for the exclusive decision of the respondent as the delegee of the Attorney General. This is a matter that gives us pause. The respondent seems to be saying that even though the treaty does not

12. Petition, Part II, A, 1(A), footnote 20.

13. Petition, Part II, A, 1(C). "The State of Current Scientific Knowledge Regarding Marihuana."

14. See Part II, A, 1(I) of Petition, "Control of marihuana in Schedule I is not required of the United States by international obligations."

15. Section 201(d), 21 U.S.C. § 811(d) provides:

If control is required by United States obligations under international treaties, con-ventions, or protocols in effect on the effective date of this part, the Attorney General shall issue an order controlling such drug under the schedule he deems most appropriate to carry out such obligations, without regard to the findings required by subsection (a) of this section or section 202(b) of this title [21 U.S.C. 812(b)] and without regard to the procedures prescribed by subsections (a) and (b) of this section. 21 U.S.C. § 811(d).

require more control than schedule V provides, he can on his own say-so. and without any reason insist on Schedule I. We doubt that this was the intent of Congress.

 On appeal to this court, Government counsel argue that the structures of the treaty (Art. 21) and pertinent statutes (CSA § 306) are such that the only way to satisfy treaty obligations is by control under Schedule I. But this is argument of counsel, which cannot take the place of reasoned decision-making by the official or agency concerned.[16] And petitioners join issue on the meaning of the Treaty and the nature of the required mechanics.

The matter is not one on which the expertise of respondent is exclusive, and it would seem appropriate for the court to have the benefit of the views of sources in the State Department and the international organizations involved.[17] If it should develop, as petitioners suggest, that there is latitude in treaty obligations depending on the country's assessment of the health aspects of the problem involved, a substantial question would arise whether the Department of Justice may insist on making these determinations without obtaining the appraisal of the Department of Health, Education and Welfare.

Our conclusion that such a remand is appropriate is fortified by the reorganization and redelegation of authority within the Department of Justice, under which the pertinent functions of the Attorney General now have been transferred to the Director of the Drug Enforcement Administration, an official who can provide a new look and a hard look at the questions raised by the petition.

The case is remanded for further proceedings not inconsistent with this opinion.

So ordered.

---

16. Burlington Truck Lines v. United States, 371 U.S. 156, 168–169, 83 S.Ct. 239, 9 L.Ed. 2d 207 (1962); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 632 (1973); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 411, 379 F. 2d 453, 465 (1967).

17. We have given petitioners leave to lodge the Commentary on the Single Convention prepared by the Secretary-General of the United Nations, but we cannot fairly undertake the task of studying this bulky document and providing its due assessment.

A rule-making proceeding may be established in phases. In the first phase, the Department of Justice could consider whether there is any latitude consistent with treaty obligations, and herein receive expert testimony limited to this treaty issue. The second phase would arise only if some latitude were found, and would consider how the pertinent executive discretion should be exercised.