**ALABAMA POWER COMPANY et al.,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

**CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner,**

v.

**FEDERAL POWER COMMISSION,**
Respondent.

Nos. 73–1436, 73–2016.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 1, 1974.

Decided Nov. 11, 1974.

---

Jerome C. Muys, Washington, D.C., with whom Thomas M. Debevoise and Paul T. Nowak, Jr., Washington, D.C., were on the brief, for petitioner in No. 73–1436. William J. Madden, Jr., Harrisburg, Pa., also entered an appearance for petitioner in No. 73–1436.

By direction of the Court, the amicus curiae brief filed in No. 73–1436 by Consolidated Edison Co. of New York was treated as petitioners brief in No. 73–2016. Donal F. McCarthy, New York City, for petitioner in No. 73–2016 and for amicus curiae in No. 73–1436.

William M. Sawyer, Atty., F. P. C., with whom Leo E. Forquer, Gen. Counsel, and George W. McHenry, Jr., Sol., F.P.C., were on the brief, for respondent.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBINSON, Circuit Judges

LEVENTHAL, Circuit Judge:

The petitioners are electric utilities regulated by the Federal Power Commission. They challenge the Commission's refusal to reconsider its practice of collecting and disseminating certain information about their fuel purchase transactions, asserting that the disclosure of information facilitates anticompetitive behavior by fuel suppliers. We affirm the Commission's dismissal of their petition.

## I. STATEMENT OF FACTS

### A. *The Commission's Data Collection Requirements*

On November 26, 1971, the Commission proposed, in a notice of proposed rulemaking, to augment its collection of data on the operations of electric utilities by requiring each utility to submit a monthly report on fuel purchases. The report was to specify certain details about every delivery of fuel at a steam generating plant during the reporting month, including the quantity and quality of fuel received, the name of the supplier, the price per unit and the expiration date of the contract under which fuel was purchased. By the terms of the regulation initially proposed, the information reported to the Commission was to remain "confidential information not available to the public or any other agency of government except insofar as may be directed by the Commission or by a court."

Various parties submitted comments in response to the Commission's initial proposal. Some utilities objected that the reporting requirements were unduly burdensome, and some indicated that, notwithstanding the Commission's announced intention to limit disclosure, the reporting of this information might eventually prove harmful to a company's proprietary interest. Other parties, however, supported the data collection effort and sought to expand disclosure of the data reported. Three federal agencies—the Federal Trade Commis-

sion, the Environmental Protection Agency, and the Office of Emergency Preparedness—indicated that the data would be useful for intra-agency studies and sought access to the data by their respective staffs. The Environmental Protection Agency and the Office of Emergency Preparedness recommended that, except for certain items, such as name of supplier (OEP) and contract expiration date (EPA), there was no reason why the data should remain confidential.[1] Still other parties—e. g., the Sierra Club, Friends of the Earth, and the Public Interest Research Group —argued for public disclosure of all the data.

After receiving written submissions, the Commission, on January 17, 1972, held a hearing at which interested parties were allowed to comment on the proposed regulation. At the hearing, at which a representative of the General Counsel of the Commission presided, the parties made oral presentations and cross-examined other participants; written statements were also accepted for inclusion in the record.

The Commission responded to the views expressed at the January hearing by focusing on the kind of information to be reported and disclosed. In a Notice of Proposed Alternatives in Rulemaking, promulgated March 9, 1972, the Commission offered two alternative forms for reporting data. The first alternative was substantially similar to the form initially proposed, requiring the utility to report details of the transaction at each plant delivery of fuel. The second form permitted utilities to report only the average unit cost, during the reporting month, of fuel delivered at plants located in a single Standard Metropolitan Statistical Area (SMSA), rather than the price paid at each plant delivery. The second form also omitted all references to the names of suppliers and contract expiration dates. The Commission proposed prompt disclosure of information reported by either form, but the averaging of cost information on the second form necessarily concealed some transaction details reportable on the first.

Following the March 9 notice, interested parties again submitted written comments to the Commission. While some utilities maintained their objections to any reporting requirement, controversy centered largely on which of the two reporting forms the Commission should adopt. Many utilities expressing a preference favored adoption of the form that allowed them to report only the average cost of fuels delivered at plants within a single SMSA. On the other hand, submissions of other parties, including those of the Subcommittee on Special Small Business Problems of the House Select Committee on Small Business, the Office of Emergency Preparedness, the Sierra Club, Friends of the Earth, and the Public Interest Research Group, expressed a preference for the form that called for information on each plant delivery, and this was the alternative the Commission adopted by promulgating Regulation 141.61[2] on June 7, 1972.

### B. The Utilities' Petition To Amend the Regulation

In January, 1973, seven months after the Commission promulgated the regula-

---

1. The Office of Emergency Preparedness stated that "except for such entries as the name of oil suppliers, the data do not appear to be of a confidential character." In a letter to the Commission, the Environmental Protection Agency suggested that only contract expiration date and mine identification should be kept confidential. At a hearing in January, 1972, an EPA representative stated that EPA had "not taken a position" on full public disclosure. Hearing Transcript at 50.

2. Order No. 453 Adding a New Section 141.-61 to Title 18 of the Code of Federal Regulations Prescribing Fuel Reporting, Docket No. R–432 (June 7, 1972). On September 12, 1974, the Commission extended the reporting requirements to include fuel received at gas turbine and internal combustion engine generating plants, as well as at steam generating plants, of electric utilities. Order No. 512 Amending Form 423, Designated in Section 141.61 of the Regulations of the Federal Power Act, Docket No. R–432(A).

tion, the electric utilities petitioned for its amendment, asserting that disclosure of information about specific transactions—especially the seller's name, the contract expiration date, and the price —had furnished fuel suppliers with new information about the utilities' willingness to pay for fuel, thereby "plac[ing] the reporting utilities at a decided disadvantage in negotiations for available ·fuel supplies." As the utilities put it in their petition:

> [A]n extremely valuable piece of bargaining information is now in the hands of the seller, viz, evidence of the price which the buyer has recently been willing or required to pay. This information is especially advantageous to the supplier, who as a member of the industry, has a good idea of the supply position of his competitors. The purchasing utility is doubly disadvantaged because it not only does not know what costs are incurred by its suppliers, but it also does not know what prices are being offered by non-utility fuel purchasers. (JA 73)

The utilities argued that availability of the information to fuel sellers could facilitate anticompetitive pricing practices by them, citing in support the cases which have held exchanges of price information to violate § 1 of the Sherman Act, e. g., United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969). The utilities asked the Commission to modify Regulation 141.61 either (1) to permit the utilities to report the average unit price of fuels delivered at each plant, rather than the price at each delivery, and to cease reporting the supplier's

name and contract expiration date; or (2) to continue existing reporting requirements but disclose the data only to other government agencies.

## C. Commission's Refusal To Amend the Regulation

In an opinion dated March 2, 1973 (hereinafter "initial opinion"), the Commission denied the requested relief on two grounds. First, the Commission asserted that it lacked jurisdiction to amend the regulation because the order promulgating it was then before this court for review on petition of the National Coal Association.[3]

As an alternative ground of decision, the Commission addressed the merits of the petition and observed that since it contained no allegation of an agreement among the suppliers to exchange information, no violation of Sherman Act § 1 had been stated. The Commission noted that the antitrust laws did not prohibit collection of information and disclosure by the Commission itself. The Commission provided, however, that

> Petitioners may file an Offer of Proof, . . . setting forth facts and other circumstances to support its allegation that disclosure of data . . . has resulted in injury to electric utilities and that such injury outweighs the public benefit from full disclosure and the relief which the Commission can grant, if any. (J.A. 85)

In an application for rehearing filed April 2, 1973, the utilities contested the Commission's disclaimer of jurisdiction to give relief, and on the merits elaborated on the arguments presented in the first petition.[4] The Commission dis-

---

3. The order was challenged in National Coal Association v. FPC, No. 72–1919. The petition for review was subsequently withdrawn on May 19, 1973.

4. The utilities alleged that each fuel supplier knew, as a result of the dissemination of transaction information, the price a utility had paid to competing suppliers; that "at least one fuel supplier" had notified a utility that, because of public disclosure it could

not continue to give the utility a favorably low price; that disclosure of transaction information had put an end to the practice of negotiating "favorable prices with the understanding that the prices would be treated as confidential"; that disclosure of price information facilitated resale price maintenance on the supply side of the market; and that given the foregoing facts, dissemination of Form 423 information to their fuel sup-

missed the application on April 16, 1973, stating that it failed to "identify with any degree of specificity, the evidence to be presented" in support of the utilities' claim of injury. The utilities took this appeal.[5]

## II. THE COMMISSION'S DISMISSAL ON THE GROUND OF JURISDICTIONAL LIMITATIONS ON RELIEF

In offering a disclaimer of jurisdiction to amend Regulation 141.61 as an independent ground for dismissal of the utilities' petition, the Commission apparently took the position that inability to grant relief during the pendency of appeal alone justified refusal to reconsider the policy embodied in the regulation. With this position we disagree.

■ Limitations on the Commission's power to modify an order during the pendency of an appeal may be inferred from Section 313 of the Federal Power Act, 16 U.S.C. § 825l, providing that the Commission may modify or set aside an order "[u]ntil the record in a proceeding shall have been filed in a court of appeals" (§ 313(a)), and that upon the filing of a petition to review a court of appeals "shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside" the order (§ 313(b)). The precise scope of these limitations has not been fully defined. The statute disables the Commission, while appeal is pending, from altering its findings or orders addressed to particular persons, entered after adjudication.[6] But a different result may obtain where the "order" entered by the Commission adopts a general regulation—a hybrid that the Commission has been using with increasing

frequency in recent times—and what is sought is a change of policy, to be effected by promulgation of a new general regulation. There is room for doubt that Congress intended by the foregoing provisions to disable the Commission, during the pendency of appeal, from reconsidering broad policy decisions, and from making prospective changes through the instrument of the rulemaking power.[7]

■ There is, however, no need here to define the precise contours of Section 313. Assuming the Commission's remedial powers to be limited during the pendency of appeal, it nevertheless retains power to consider a petition for amendment and to defer until disposition of the appeal any modification found appropriate or, in a case of urgency, to apply to the reviewing court for a remand order so as to permit amendment. *Compare* Smith v. Pollin, 90 U.S.App.D.C. 178, 194 F.2d 349 (1952). Thus in this case the pendency of the National Coal Association's petition to review,[8] even assuming that it temporarily barred amendment, did not itself warrant a refusal to consider the utilities' petition.

■ An agency may, of course, keep its administrative burden manageable by refusing to engage in protracted reconsideration of a decision reached after thorough exploration of the matter in a prior rulemaking proceeding. It may, for example, limit reexamination of a particular matter to reasonable intervals, to insure that reconsideration occurs against an adequate background of experience, and to conserve administrative resources by providing interested parties an incentive to introduce in a

---

pliers will result in a completely new basis for negotiating fuel supply contracts and prices to Petitioners and other electric utilities for fuel in each market higher than if such information is not available to their fuel suppliers, to the injury of Petitioners and their customers. . . . (J.A. 93–94).

5. *See* 16 U.S.C. § 825l (1970).

6. *See* Dyer v. SEC, 289 F.2d 242, 244 (8th Cir. 1961) (construing virtually identical

language of Public Utility Holding Company Act of 1935).

7. The Executive has a "responsibility to give appropriate consideration" to petitions for amendment. Nat'l Org. for Reform of Marijuana Laws (NORML) v. Ingersoll, 162 U.S.App.D.C. 67, 497 F.2d 654, 657 (1974).

8. National Coal Association v. FPC, *supra*, note 3.

single proceeding all information pertinent to the issues presented. *See* Permian Basin Area Rate Cases, 390 U. S. 747, 777–780, 88 S.Ct. 1344, 20 L.Ed. 2d 312 (1968) (permitting FPC to impose temporary moratorium on rate increase filings); Western Airlines, Inc. v. CAB, 161 U.S.App.D.C. 319, 495 F.2d 145 (1974).[9] The ability to defer reconsideration as a matter of sound administrative practice is, however, totally different from a self-imposed jurisdictional barrier that would inhibit consideration of a problem raised even by a meritorious and urgent application.

Despite our disagreement with any intimation that the Commission was jurisdictionally inhibited from considering the utilities' application, we do not endow injury here. The Commission, despite the overtones of a jurisdictional disclaimer, permitted a renewed application for relief and in its order on rehearing focused on deficiencies that went to the merits. Accordingly, we proceed, in the interest of justice, 28 U. S.C. § 2106, to a review of that determination.

## III. THE COMMISSION'S RESPONSE TO THE ASSERTION OF ANTICOMPETITIVE EFFECTS

We begin our consideration of the Commission's treatment of the merits

with the comment that the initial opinion of March 2 carries an indication that the Commission did not perceive the thrust of the utilities' prayer for relief. The Commission confined itself to observing that no Sherman Act violation had been alleged. That was simply no answer to the utilities' central contention that while disclosure of information by the Commission was concededly lawful, its availability to fuel suppliers would facilitate interdependent pricing behavior, contrary to the policy objectives of the antitrust laws.[10] And the Commission's subsequent order denying relief for lack of specific evidence, although it begins to approach identification of the deficiencies of the utilities' petition, has a Delphic simplicity that fails to give a reviewing court confidence that the agency has taken a "hard look" and has "genuinely engaged in reasoned decision-making." Greater Boston Television Corp. v. FCC, 143 U. S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S. Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).

The utilities' petition, however, came only seven months after the rulemaking proceeding in which the general matters of data collection and disclosure had been thoroughly ventilated. When the Commission's response is viewed against that background, its approach emerges with reasonable clarity.[11]

9. The agency's need to control the use of its resources is recognized as well in those cases holding that an agency may defer reconsideration of policy decisions until completion of staff studies, even when it is alleged that grave risks might be posed by continuation of the status quo. *E. g.*, Nader v. FAA, 142 U.S.App.D.C. 264, 440 F.2d 292 (1971).

10. Disclosure of the details of every transaction may facilitate interdependent pricing or "conscious parallelism" by firms in an oligopolistic market. In markets characterized by few sellers, secret shading of announced prices may provide the only form of price competition; publicizing transaction prices will chill price competition by foreclosing any opportunity for a seller to lower his price without fear of detection and retaliation by rivals. The chilling effect flows from publicity itself and does not de-

pend on who collects or disseminates the information. Although the anticompetitive effects of information are usually discussed with reference to a market characterized by oligopoly on the supply side alone, concentration may occur among purchasing firms as well; circulation of transaction data may allow a few buyers to gain at the expense of many sellers.

For a discussion of the effect of information on oligopolistic pricing, see F. M. Scherer, Industrial Market Structure and Economic Performance 449–53 (1970).

11. The parties have provided the court with certain excerpts from the record in the rulemaking proceeding. We approve that course, even though it was not formally incorporated into the record of the present docket. Patently, familiarity with the rulemaking proceeding was indispensable to our understanding of the Commission's disposi-

In the rulemaking proceeding, those parties urging the Commission to obtain and disclose information about each fuel purchase transaction argued that only information of such detail would permit accurate studies to be made of such matters as the relationship between fuel price, quality, and environmental effects of use. This is a positive research benefit from disclosure—which is something more than an abstraction or theology that disclosure is good for its own sake, or for moral elevation.

The utilities seeking more limited reporting and disclosure did not essentially dispute the assertion of benefits of detailed disclosure as an aid to research studies. Instead the utilities raised essentially the same objection they now make—that disclosure of information would lead to bargaining disadvantages in future fuel contract negotiations. While the objection was not couched in "antitrust" terms, at least some participants referred to the predicted bargaining disadvantages as "anticompetitive."[12] The merits of this objection were disputed by the parties favoring full disclosure, who pointed to the apparent anomaly that both fuel buyers and sellers foresaw bargaining disadvantages if information were disclosed, and to the lack of specific illustrations drawn from industry experience to suggest the likelihood and magnitude of injury. Moreover, several parties asserted that any bargaining disadvantage sustained by either a purchaser or seller of fuel as a result of disclosure would not amount to an anticompetitive effect but would merely reflect the removal of information imperfections in an otherwise competitive market, thereby facilitating efficient allocation of resources. As the Public Interest Research Group put it:

Cost information will at most affect the speed with which the market responds to factors of supply and demand. The public interest is in improving the market mechanism as a means of rationalizing economic decisions both by utilities and coal companies. Adequate information will encourage efficient allocation of resources by making the market more responsive to changes in supply and demand.

* * * * * *

If the fears of losing a favorable position expressed by both sellers and buyers are justified and if both expect that making cost data available will remove their advantage, it is clearly to the public's interest to make that information available. On the other hand, if these fears are ungrounded and either the favorable position is imagined or is such that it will not be affected by the information, then there is no competitive justification for not making that cost data available.

Public Interest Research Group Comment on Rulemaking, April 5, 1972, J.A. 44–46. *See also* Transcript of hearing at 90–4, 106–110, 114–25.

■ Submissions like the foregoing put in issue the structure and performance of the markets in which the utilities purchase fuel. Further information on these matters was an essential part of any demonstration that disclosure of transaction data would pose risks of an-

tion before us on review. To enhance further our understanding of the present case, we directed counsel for the Commission to lodge with the court a transcript of the hearing held on January 17, 1972. Since the petitioners at bar were parties to the rule-making proceeding and they advert to those proceedings in seeking relief, we see no difficulty with our use of the record made there to decide the present case. The facts here do not present the kind of difficulties in the use of a record made in another proceeding which prompted our ruling in Public Service Commission of New York v. FPC [Texas Gulf Coast Area Rate Cases], 159 U.S.App.D.C. 172, 487 F.2d 1043, 1069–1070 (1973), vacated and remanded for reconsideration, 417 U.S. 964, 94 S.Ct. 3167, 41 L.Ed.2d 1136 (1974).

12. At the hearing conducted on January 17, 1972, the representatives of some utilities stated that they were not opposed to collection of detailed transaction data or to its disclosure. *See* Transcript of hearing at 24 (statement of Mr. Fry). Those utilities

titrust significance.[13] Yet no additional material was adduced by either the utilities or fuel suppliers—the parties who were both in a position to provide evidence and had an incentive to do so. Their failure to make any additional proffer allowed the reasonable inference that disclosure posed no substantial risks of anticompetitive behavior.[14] Accordingly, the Commission based its adoption of the reporting form on the public benefits that would flow from making specific transaction data available to serve research objectives and facilitate market allocation of fuel, concluding that the reporting form adopted would furnish information in its most useful form and would thus be "significantly greater in analytical value" than the alternative.

The utilities' petition for amendment filed seven months later added only one new allegation: that the utilities had actually experienced the bargaining disadvantage prophesied during the rulemaking proceeding. But the utilities were not prepared to give any specifics whatever as to the existence of an injury. Their presentation on rehearing gave no details as to market structure to show that the claimed bargaining disadvantage might plausibly result from sellers' anticompetitive behavior, rather than from the termination of the utilities' informational advantage based upon sellers' ignorance.[15] The Commission treated the utilities' presentation as merely a renewal of the arguments made against disclosure in the rulemaking proceeding and, since no new evidence was adduced,

that were opposed objected on the grounds that reporting was burdensome and that disclosure would lead to bargaining disadvantages. *See* Transcript at 25–27, 29–32, 33–40, 63–65, 69–70, 87–89, 91–94. The National Coal Association also asserted that disclosure would cause bargaining disadvantages for its members. Transcript at 11–25.

13. In general, information is of anticompetitive concern only where market structure does not tolerably approximate that of perfect competition. Perfect information available to all buyers and sellers is, indeed, one of the conditions of the economic model of "perfect competition," and where the remaining conditions are satisfied, dissemination of information tends to facilitate prompt adjustment to the market clearing price by all parties to transactions. A sudden improvement in the availability of information may deprive a buyer of an advantage he enjoyed when, under more imperfect dissemination, he exploited a seller's ignorance of the market price. Advantages like these reflect the reality of cross-currents in a mixed market structure. Generally, however, laws and practices to safeguard competition assume that its prime benefits do not depend on secrecy of agreements reached in the market. The prime advantage of a competitive market is overall efficiency in allocation of resources. While there may be reasons for temporary secrecy to avoid collusion and enhance competition, as in sealed competitive bids, even here secrecy is displaced with the opening of bids and award of the contract.

14. It is a familiar rule of evidence that a party having control of information bearing upon a disputed issue may be given the burden of bringing it forward and suffering an adverse inference from failure to do so. *See* McCormick, Evidence § 337 at 787 (2d ed. 1972). In regulatory proceedings, placing such a burden on the regulated firm, where the relevant information concerns its operations and management, has become part of the "common lore" of regulations. *See* Commonwealth of Puerto Rico v. FMC, 152 U.S.App.D.C. 28, 36, 468 F.2d 872, 880 (1972).

15. The Commission's order of March 2, 1973, permitted petitioners to file an offer of proof "setting forth facts and other circumstances to support its allegation that disclosure of data under Form 423 has resulted in injury to electric utilities." Petitioners' application for rehearing recited that they were not complying with this provision, stating: "[I]n effect [this provision] requires the Petitioners to put a dollar value on their injury from dissemination of Form 423 since last September. Petitioners do not believe that proof of the size of the injury in that time frame (which is impossible to establish with any accuracy) is required to sustain their position under the foregoing offer of proof." (J.A. 94–95). Petitioners' restatement does not fairly characterize what the FPC order provided.

rested its denial on what it had said in promulgating the data-collection regulation.

■ The utilities point out that because their proposal to report the average cost of fuel received at a plant was not among the alternatives considered in the rulemaking proceeding, the Commission has never made a finding that the present practice is comparatively superior. While not disputing that the Commission's presentation of two alternatives was a reasonable judgment, designed to focus attention in the rulemaking proceeding, the utilities say that the Commission has a present obligation to address their proposal. This contention is not necessarily without merit, at least as addressed to the agency's discretion, and possibly in an appropriate case as supporting a challenge to an agency's adherence to a regulation without giving suitable opportunity for reconsideration or modification "in the light of actual experience." *Compare* American Airlines, Inc. v. CAB, 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633 (en banc), cert. denied, 385 U.S. 843, 87 S.Ct. 73, 17 L. Ed.2d 75 (1966). But in this case the third alternative was one that the utilities could have put forward in the rulemaking proceeding. While the Commission's March 1972 notice focused on two proposed 'alternative forms, we cannot suppose that the Commission would have rejected as "out of bounds" a comment suggesting that it combine parts of both forms.[16] Having failed to introduce such a suggestion the utilities were on notice that this was a subject the Commission did not intend to consider afresh without some kind of factual showing. This was a reasonable position for the agency to take. There is, after all, a significant difference between a system for the exchange of information solely among the firms of one side of the market, as in United States

v. Container Corp., 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), which may be condemned without a particularized showing of harm because of the accompanying danger of collusion, and a system whereby information is made available to all participants in the market (*compare* footnote 13 *supra*). Public disclosure of information by the Commission does not present the same risk; since the Commission has found benefits in such public disclosure, it may reasonably require a showing of harm before changing its mind. Orderly functioning of the administrative process requires some degree of finality when rulemaking reaches its conclusion, and although an agency cannot rigidly shut its ears to cries of "new ideas" it can insist that their proponents accompany them with a reasonably firm factual underpinning. We believe the Commission satisfied its obligation when it examined the utilities' petitions for amendment and found no new material bearing on the harm caused by disclosure of detailed transaction information.

■■ In upholding the Commission, we acknowledge that its orders, both in the original rulemaking and in response to the petitions for amendment, are not paragons of clarity. Greater specificity in identifying the deficiencies in the utilities' arguments against disclosure would have been laudable; indeed, a more carefully reasoned dialogue among the antagonists might have obviated the need for this appeal. But we do not review agency action in order to perfect the administrative process to the nth degree. A court should uphold an agency, even when its findings lack ideal clarity, if "the agency's path may reasonably be discerned." Here, the Commission's path to decision emerges from the course of the rulemaking proceeding, and we are not obliged to "guess as to the agency's findings or reasons." [17]

16. The March 9, 1972, notice provided that interested persons may submit comments "concerning all or part of the rulemaking options proposed herein."

We note that the only petition for rehearing of Order No. 453, adopting the regula-

tion, was one filed by the National Coal Association.

17. Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971).

The utilities took no appeal from the Commission's order promulgating the regulation the amendment of which they seek. Once that order became final, the Commission was not required to consider afresh a claim of injury thoroughly ventilated in the earlier proceeding and now reargued without any new evidence in support.

The utilities remain free to present a new petition for amendment of regulation 141.61, accompanied by factual representations sufficient to fill the gaps that have been identified in their earlier submissions. The Commission retains continuing oversight and, subject to reasonable rules to limit administrative burden,[18] a responsibility to consider such a presentation. Special obligations may be triggered by a persuasive claim that an agency has overlooked considerations of such import as those embodied in the antitrust statutes. That the general policy of promoting competition in the market is an important component of regulation in the public interest is a principle both longsettled, *see* McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944), and of current vitality, *see* Gulf States Utilities v. FPC, 411 U.S. 747, 757–760, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973). The Commission of course lacks principal responsibility for the implementation of antitrust policy; indeed, it may be accustomed to viewing matters in terms of the paradigm of monopoly regulation rather than of markets lubricated by competitive conditions. Other agencies, having primary concern with enforcement of the antitrust statutes, are presumably able to assist the Commission by giving advice on disputed issues of antitrust policy and by identifying the factual questions relevant to an assessment of the anticompetitive impact of a proposed action. The opportunity for consistency and evenhandedness in the development of policy that Congress has put within the ken of several administrative bodies is enhanced when one agency elicits the views of another and draws upon the latter's expertise. Such a procedure would embody sound administrative practice.[19] The Commission retains an obligation to give reasoned consideration to the bearing of antitrust policy on matters within its jurisdiction.

Affirmed.

FAHY, Senior Circuit Judge (dissenting):

In considering the several orders of the Commission culminating with its order now on review, I am unable to agree that the Commission has complied with the obligation of explaining its decision in a manner to which the parties are entitled and which affords an adequate basis for favorable court review.

**I**

In the original Order, No. 453, issued June 7, 1972, the Commission amended section 141.61 of its regulations so as to require certain steam-electric generating utilities to file a monthly report on FPC Form No. 423 listing data on cost, quality and source of supply of fuels the utilities receive.[1] In promulgating this ma-

---

18. *See* text at note 9 *supra*.

19. *See* City of Pittsburgh v. FPC, 99 U.S. App.D.C. 113, 126, 237 F.2d 741, 754 (1956).

1. In the Commission's Notice of Proposed Rulemaking of November 26, 1971, the reasons given for "promulgation of the proposed Form No. 423" were stated as follows:

   (a) to provide monthly information on the availability and cost of fossil fuels to electric utility companies for use in current analyses of the energy and fuel supply situation and the effects on the cost of electric power; (b) to provide timely data on a comparable basis for each type of fuel by quality determinants, thus facilitating the evaluation of developments in fuel supply which may affect the reliability of electric service, emergency preparedness, and the environmental improvement programs for the different air quality control regions in the United States; and (c) to assist the Commission generally in

jor change in its administration of the Federal Power Act the Commission considered two alternative versions of the form to be used. Alternative A was adopted. It requires full disclosure of the cost and source of supply of purchases by individual plants. The Commission believed this alternative would best serve the public interest since it would supply the fuel cost and quality statistics in the most useful form and thus would prove to be "significantly greater in analytical value." Alternative B would have permitted the plants to supply the information without fully disclosing the costs and source of supply of each fuel purchase. One reason stated by the Commission for rejecting this alternative was that it,

> would force the smaller utilities to make a proportionately greater disclosure of cost information than their larger competitors from which contract terms can be deduced and thus place them at a competitive disadvantage in the fuel market.

While the adverse competitive effect upon small utilities of Alternative B compared with Alternative A was recognized, the Commission made no reference to the anti-competitive effect among competing fuel suppliers of disclosure of their respective contractual terms with the utilities, as required by Alternative A, asserted by the utilities to be inconsistent with the policies of the antitrust laws.

The National Coal Association filed a petition for rehearing respecting Order No. 453, with its Form 423, alleging it required disclosure of data of a proprietary and commercial nature which could have a seriously disruptive effect on the competitive structure of the energy market. In denying the petition by order of August 3, 1972, the Commission was si-

lent upon the subject of antitrust policy, simply stating:

> The NCA petition for rehearing raises no issues which were not considered by the Commission prior to the adoption of Order No. 453. Moreover, having reconsidered the issues raised in the NCA petitions, the Commission is of the opinion that its Order No. 453 is correct.

However, Order No. 453, as we have seen, neither explicitly states nor otherwise reflects any prior consideration of the allegedly seriously disruptive effect on the competitive structure of the energy market, except the special problem noted with respect to the smaller utilities, which influenced the adoption of Alternative A rather than Alternative B.

Sixteen electric utilities, including our present petitioners, then filed a "Petition of Certain Electric Utilities for Amendment of Commission's Regulations with Respect to Form No. 423." This petition clarified the issue of conflict between the disclosure required and the policy of the antitrust laws. To avoid this conflict an amendment was sought to require only "the average cost of fossil fuels delivered to a plant . . . instead of the actual price of each delivery" and, also, the elimination of "the reporting of information with respect to the identity of the fuel supplier and the date of contract expiration." In the alternative the utilities requested that unless otherwise ordered by the Commission the forms containing the required data be made available only to the staff and members of the Commission and to other federal agencies upon written request of the agency head and not made available to any other person. The petition included an offer of proof "that electric utilities and their customers stand to be injured in fuel contract negotiations by the require-

the proper administration of the Federal Power Act.

These reasons for the proposed Form are merely reiterated in the Order of June 7,

1972, as having been listed in the Notice, without more.

ments of section 141.61 [which embodies Order No. 453]. . . ." The petition also stated that "In the event the Commission orders an evidentiary hearing on this petition, they offer to prove that the forms are in fact being used in contract negotiations by fuel suppliers. . . ."

In its Order of March 2, 1973, denying the petition the Commission held that due to petitioners' failure to seek rehearing of Order No. 453 petitioners were precluded from seeking court review,[2] and for the Commission to amend an order then under judicial review[3] would be tantamount to usurping appellate court jurisdiction. For this reason the petition to amend was denied for lack of jurisdiction. Nevertheless, assuming jurisdiction pertained, the Commission adverted to what it considered to be petitioners' suggestion that the order violated United States v. Container Corp. of America, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), and also considered other reasons advanced to support the suggested amendments. The Commission mistakenly characterized petitioners' position as urging "strict application of antitrust laws to electric utilities and would preclude the Commission from considering whether or not disclosure of such data serves the overriding public interest." It stated that in regulated industries increased competition may sacrifice efficiency and retard investment; moreover, "The application of antitrust policy to public utilities requires a balancing of the public interest in energy supply at a reasonable price so as to achieve the most efficient allocation of our limited resources against the potential anticompetitive ef-

fects of the proposed action." Pointing out there was no agreement to exchange price information as in *Container*, the Commission said it refuses, "to apply a *per se* antitrust rationale to electric utilities, without further inquiry into the competitive effects of disclosure" of the data, and if the fuel suppliers agreed among themselves to fix or interfere with the prices paid by utilities, resort could be had to the Department of Justice. The Commission then characterized its position as follows:

> Our determination is not in the context of immunizing any alleged antitrust violations, but is a determination that disclosure of such data, absent a showing to the contrary, serves the public interest. (Footnote omitted.)

Assuming *arguendo* that the *Container* rationale were applicable to Form 423 and that certain anti-competitive restraints would develop, the Commission stated that petitioners ignore that it is "government action" which requires the disclosure for the benefit of the public and petitioners cannot allege, "as is implied in their" petition, that the Commission had violated the antitrust laws.[4]

The Commission added, however, in this Order of March 2, 1973, that it would grant petitioners an opportunity, in aid of their request for a public hearing, to submit a written offer of proof that Form 423 had injured electric utilities and their customers in fuel contract negotiations, adding further that, if injury has occurred, "petitioners must show that such injury outweighs the public benefit from full disclosure."

Thus, disclosure of the pricing details was given a preferred position, as pre-

---

2. Section 19(a) of the Natural Gas Act, 15 U.S.C. § 717r(a).

3. The National Coal Association had filed a petition for review in this court. However, on May 14, 1973, a motion for voluntary dismissal was granted.

4. The Commission also rejected petitioners' claim of exemption from disclosure under the Freedom of Information Act, 5 U.S.C. §

552(b)(4), which applies to trade secrets and commercial or financial information. This contention was rejected because, the Commission states, "Disclosure will not undermine the competitive positions of utilities." I assume the correction of the Commission's rejection of the applicability of 552(b)(4) to prevent disclosure, a matter quite aside from the main thrust of the position of the utilities based on the policy of the antitrust laws.

viously the Commission had accorded it in its decision that "disclosure, absent a showing to the contrary, serves the public interest."

Petitioners applied for rehearing, and included an offer of proof. They offered to prove, *inter alia*, that the fuel suppliers have informed petitioners that by reason of Form 423 the fuel suppliers know their competitors' prices to petitioners, and that at least one fuel supplier has informed a petitioner directly that because of the public dissemination of its prices on Form 423 it will be obliged to raise its price to the petitioner to conform with prices it charges others, that no longer was it possible for petitioners to negotiate favorable prices with the understanding they would be confidential; that in one fuel supply market an existing control structure is strengthened when the resale price to petitioners is available on Form 423; and that "given the foregoing facts, dissemination of Form 423 information to their fuel suppliers will result in a completely new basis for negotiating fuel supply contracts and prices to Petitioners and other electric utilities for fuel in each market higher than if such information is not available to their fuel suppliers, to the injury of Petitioners and their customers. . . ."[5]

The Commission by Order of April 16, 1973, denied rehearing. It reasserted

lack of jurisdiction due to failure of petitioners to have sought judicial review of Order No. 453, but added: "We need not restate our reasons for denial as found in our March 2 Order, pp. 2–5." Referring then to that part of the March 2 Order which afforded petitioners an opportunity to submit a written offer of proof, the Commission characterized their allegations as general and unspecific. Once again the Commission placed disclosure of the pricing information in a preferred position, stating, "[t]here are no facts set forth nor have Petitioners shown that even if they have been injured, . . . 'such injury outweighs the public benefit from full disclosure.' "

## II

Once the jurisdictional issue is solved, as the opinion of Judge Leventhal accomplishes, one attempts, unsuccessfully, to find in the above analysis, believed to be a fair exposition of the several orders, why there is an overriding public interest to be served by disclosure of the data, or its disclosure in the detail required by Form 423, in face of the policy of the antitrust laws. The Commission simply concludes that full disclosure is in the public interest and requires that petitioners prove the contrary.[6]

In view of the policies of the antitrust laws, and their importance, I think this

---

5. The application for rehearing contains the statement, following the detailed offer of proof:

[It should be noted that the foregoing offer does not comply with that part of Ordering Paragraph (B) of the Commission's Order of March 2, 1973 which in effect requires the Petitioners to put a dollar value on their injury from dissemination of Form 423 since last September. Petitioners do not believe that proof of the size of the injury in that time frame (which is impossible to establish with any accuracy) is required to sustain their position under the foregoing offer of proof. See United States v. Container Corp. of America, *supra*.]

6. Moreover, the court does not accept this conclusion as the basis for its affirmance. The court decides that the utilities were not in an acceptable procedural position to maintain their petition to amend, having waited some seven months after issuance of Order No. 453 to petition for its amendment. The court also considers petitioners' offer of proof not sufficiently specific, but the court fails to approve the basis given by the Commission for its decision, indeed intimating that perhaps it was inadequate. The petition to amend, though filed seven months after the order was issued, I think was not too late; for the first time it clearly posed the conflicting public interest values. To wait longer, as the majority suggests in pointing out that a similar petition to amend could still be filed, would I think serve no purpose not ready to be served now.

conclusion is not so obvious as to supply its own support. There is no self-evident reason why the public interest in energy supply at a reasonable price, so as to achieve the most efficient allocation of our limited resources, is served by disclosure of the Form 423 data, and the uses to which the data could or would be put to obtain the purposes stated are not explained. In the absence of explanation I do not think we should accept the conclusion stated, especially when its absence deprives the court of a basis for comparative consideration of the conclusion in light of the policy of the antitrust laws.

In the second place, it seems to me that the Commission reached its decision, at least in good part, upon a mistaken theory by attributing to the utilities a position that the required disclosure led to violation of the antitrust laws by them or by the Commission, or both. This was not the position of the utilities. To the undetermined extent that the Commission's decision rests upon this misapprehension the decision lacks foundation. There had been no suggestion that Order No. 453 rendered either the utilities or the Commission in violation of the antitrust laws. What the utilities have contended is that making available to the competing fuel suppliers the detailed pricing information of each with respect to fuel sold the utilities leads to anti-competitive consequences inconsistent with the policy of the antitrust laws, in turn thereby injuring the utilities in negotiating for fuel, with ultimate injury to the consumers of electric energy. When the Commission refers to "[t]he application of antitrust policy to public utilities" as requiring a balancing of the public interest in energy supply at a reasonable price, "against the potential anticompetitive effects of the proposed action", the context indicates the Commission had in mind a balancing of the anti-competitive effects between the utilities. I do not understand this to be the problem presented. The balancing required is to compare the asserted public interest in

the energy supply said to be served by the disclosure, on the one hand, and, on the other hand, the public harm of the anti-competitive consequences in the fuel supply industry, incident to each competing supplier having made available to it the details of its competitors' contractual arrangements with the utilities. This is said to result in more disadvantageous arrangements forced upon the utilities than might otherwise be the case, to the ultimate injury of consumers of electricity.

Furthermore, the Commission does not explain why its view that the public interest served by the details required to be furnished on Form 423 could not be adequately served by requiring only the average costs of fossil fuels delivered to a plant instead of the actual prices, and by the elimination in the reporting of the identity of the fuel suppliers and dates of contract expirations, all as suggested by petitioners.

Even were we to assume that in the exercise of its expertise the Commission was entitled without explanation to find that the public interest in energy supply at a reasonable price would be served were the data specified on Form 423 considered without regard to the policy of the antitrust laws, the Commission was not in my opinion entitled to give overriding weight to this public interest factor when confronted with the claim of petitioners that the making of this information available to competing fuel suppliers was inconsistent with the policy of the antitrust laws. I think it then became incumbent upon the Commission to consider the potential adverse effect upon the public interest arising from this claim and to weigh or compare it with the public interest in disclosure. The Commission seems to have recognized this only to the extent of placing the burden upon petitioners to establish anti-competitive injury to themselves or their customers to a degree to overcome the Commission's determination previously made of an overriding public interest in full disclosure as specified in Form 423.

### III

Faced with (1) the offers of proof of anti-competitive effects of the required disclosure of contractual data, including pricing terms, and (2) additional predictable effects of like character, the Commission in my view was obligated to have explored more closely this phase of the problem as it bore upon the public interest in "the fundamental national economic policy expressed in the antitrust laws." Gulf States Utilities Co. v. FPC, 411 U.S. 747, 759, 93 S.Ct. 1870, 1878, 36 L.Ed.2d 635 (1973). The exploration should include analysis of the question whether, in view of the policy of the antitrust laws, disclosure only of regional averages of prices, as suggested by petitioners, rather than the details required by Form 423, would better serve the public interest. Such exploration need not depend upon actual violation of the antitrust laws.

> Consideration of antitrust and anti-competitive issues by the Commission, moreover, serves the important function of establishing a first line of defense against those competitive practices that might later be the subject of antitrust proceedings.

*Id.* at 760, 93 S.Ct. at 1878, Moreover,

> The exchange of price data tends toward price uniformity. . . . Stabilizing prices as well as raising them is within the ban of § 1 of the Sherman Act.

United States v. Container Corp. of America, *supra,* 393 U.S. at 337, 89 S.Ct. at 512.

Although here the price data is not "exchanged" directly by the fuel suppliers, and there is no suggestion the latter violate the antitrust laws simply by coming into possession of the data, the acquisition of the information by reason of Order No. 453 places in their hands the same anti-competitive weapon as though received directly from their competitors.

The Commission must maintain a regard for consumer interest in price. New emphasis on energy shortage may

indeed modify this regard, but it cannot eliminate it. See Atlantic Rfg. Co. v. Pub. Serv. Comm'n, 360 U.S. 378, 388, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959).

The Commission I think was not warranted by the record in adhering to the position that disclosure occupied a preferred position in the public interest—even if appropriately granted initially—unless overcome by evidence to the contrary, when confronted by the anti-competitive effects inconsistent with the policy of the antitrust laws. The Commission should at least have reconsidered the matter on an open basis rather than to have continued to accord disclosure an overriding public interest value. Only the public interest maintains a preferred position throughout Commission deliberations.

### IV

I must conclude that the Commission "has not genuinely engaged in reasoned decision-making." Greater Boston Television Corp. v. F.C.C., 143 U.S.App.D.C. 383, 29 L.Ed.2d 701, 444 F.2d 841 (1970), cert. denied, 403 U.S. 923, 91 S. Ct. 2229, 2233 (1971). If findings of fact, supported by substantial evidence were requisite, none appears. *Greater Boston,* however, was adjudicatory, whereas our case is of a rule-making character; so it may be said as to anti-competitive issues that there is,

> . . . no objection in law to a disposition without hearing that is accompanied by an explanation, supported in the record, that the . . . contentions are too insubstantial or barren to indicate the existence of substantial anticompetitive issues.
> · · ·

City of Lafayette, Louisiana v. Securities & Exch. Com'n, 147 U.S.App.D.C. 98, 454 F.2d 941, 953 (1971). And see, Judge Robb's recent opinion for the court in Moss v. F.P.C., 502 F.2d 461 (1974). The disposition of the present proceeding "without hearing," however, was not accompanied by such an explanation supported in the record.

If the denial of a hearing sought by petitioners is to stand, then I think we must find in the Orders a reasoned basis for the required disclosure without the need of a hearing. I do not find this, nor do I find that the conflicting factors bearing on the public . interest are weighed on the record in a manner which supports the conclusion reached.

Petitioners' offer of proof was rejected as an inadequate basis for a hearing (1) without accepting the facts offered to be proved as true and deciding, if true, whether they adequately countered the Commission's predetermined public interest conclusion, and (2) without permitting a further development of the truth of the anti-competitive effect of disclosure inconsistent with the policy of the antitrust laws.

It seems to me that the Commission, without adequate supportive articulation, has made an overriding determination in favor of the detailed disclosure, and has done this also without analytical appraisal of the public interest in disclosure, modified disclosure or nondisclosure. It has cast upon petitioners the burden of dislodging the determination made independently of considerations asserted to be adverse to such disclosure. In determining the relative public interest in detailed disclosure, modified disclosure or non-disclosure, it has not developed or analyzed on the record, or permitted to be developed or analyzed, the effects of full disclosure asserted to give rise to consequences inconsistent with the policy of the antitrust laws. Values and non-values have not been adequately identified and then weighed on the scale of the public interest.

The following statement of our court, though made in a different factual context, seems to me to have particular relevance, even if not literally to be applied in all respects to this case:

. . . because competitive considerations are an important element of the "public interest," we believe that in a case such as this the Commission was obliged to make findings related

to the pertinent antitrust policies, draw conclusions from the findings, and weigh these conclusions along with other important public interest considerations.

Northern Natural Gas Co. v. Federal Power Com'n, 130 U.S.App.D.C. 220, 399 F.2d 953, 961 (1968).

I would remand the case to the Commission for reconsideration of Order No. 453 and Form 423 upon the basis of a fuller record or with a more detailed analysis of the basis for the conclusion reached, aided by the experience which has intervened. *Cf.*, American Importers Association v. C.A.B., 154 U.S.App. D.C. 38, 473 F.2d 168, 175 (1972).